United States Court of Appeals,

Fifth Circuit.

No. 92-1618.

Peter W.G. McNEILY, Liquidator for Independent American Participating Income Fund, L.P., Plaintiff-Appellant,

v.

UNITED STATES of America;  Resolution Trust, as Conservator for Sunbelt Federal Savings, FSB;  Resolution Trust Corporation, as Receiver for Sunbelt Savings, FSB;  Federal Deposit Insurance Corporation, as Manager of the Federal Savings and Loan Insurance Corporation Resolution Fund, et al., Defendants-Appellees.

Nov. 10, 1993.

Appeal from the United States District Court for the Northern District of Texas.

Before GARWOOD, DAVIS and SMITH, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellant challenges the dismissal of his damage suit against the United States and the Federal Deposit Insurance Corporation (FDIC)[1] for actions taken by federal regulators with respect to a failed thrift and its subsidiaries.  Finding the claims barred under the Federal Tort Claims Act, we affirm.

I.

Appellant W.G. McNeily is the liquidator of Independent American Participating Income Fund, L.P. (the Income Fund), a dissolved Delaware limited partnership.  He was appointed liquidator after the Income Fund's managing general partner, Independent American Real Estate, Inc. (IARE), filed a bankruptcy petition.  IARE was a wholly owned subsidiary of Independent American Savings Association (IASA), formerly a Texas-chartered savings and loan association.

McNeily's fifth amended complaint alleges that in 1983, IASA's controlling stockholder, Thomas A. Gaubert, embarked on an aggressive program of lending and investing in Texas's commercial real estate market.  The complaint further alleges that IASA created the Income Fund as a part of a scheme to deceive and defraud investors.  The fund's stated purpose was to buy

---

[1]The FDIC has been sued as the statutory successor to the Federal Savings and Loan Insurance Corporation (FSLIC).

participations in first and second mortgage loans and other real estate loans which were held by IASA. By means of three instruments, the partnership agreement, the prospectus, and the mortgage service agreement, investors were led to believe that they would be buying into a safe investment in a diversified commercial loan portfolio for Individual Retirement Accounts and Keough Plans. According to these documents, IASA was the income fund's sole source of loan participations. IASA agreed to identify loan opportunities for the Income Fund, negotiate the terms of the loans, investigate the borrower's financial condition, and obtain its own independent appraisals. The ultimate decision of whether the fund would invest in any participation was up to the Income Fund's loan committee. The documents set forth various rules that the loan committee was required to follow. For example, each participation had to be "economically advantageous to the partnership in light of all surrounding circumstances"; the Income Fund could not acquire a participation which exceeded 157 of the value of the portfolio, or which caused the portfolio to be invested more than 507 in risky land and constructions. All construction loans required a construction bond, and the Income Fund was required to obtain a written opinion from an "independent, qualified advisor" that the purchase price of the participation was fair. Between March of 1985 and March of 1986, the Income Fund raised about $21,000,000.

The fifth amended complaint alleges that, notwithstanding what the investors were told, IASA intended, from the beginning, to use the fund as a means of pawning off its bad loans. The Income Fund's loan committee, consisting of Richard H. Crowe, Jr., Jack R. Gaubert (J. Gaubert) and Tommy G. Lane, was never independent from IASA: Crowe was a member of IASA's Board of Directors, a Vice-President of IASA, a member of IASA's loan committee and executive committee, a substantial stockholder of IASA, a member of IARE's board and, at various times, IARE's chairman, CEO and president; J. Gaubert was a member of IASA's Board of Directors, at various times, the Board's vice-chairman and chairman, an officer of IASA, a member of IASA's loan committee and executive committee, a substantial stockholder of IASA, a member of IARE's board, and a senior vice-president of IARE; and Lane was IASA's Chairman of the Board and president, a member of IASA's loan committee and executive committee. The "independent qualified advisor"

promised in the documents turned out to be Arthur L. Westcot, a senior vice-president of IASA, a member of IASA's senior loan committee, and a substantial stockholder of IASA. Not surprisingly, the Income Fund's loan committee did not turn down a single proposal offered by IASA.

The fifth amended complaint details a list, stretching from July 1985 to April 1986, of risky and/or worthless loan participation purchases proposed by IASA and approved by the Income Fund's loan committee. For example, between July and September of 1985, the Income Fund purchased participations in loans known as Trafalgar, Trinity, Regency, and Landmark. The complaint alleges that IASA and the Income Fund's loan committee violated material provisions of the partnership agreement prospectus and mortgage service agreement.

For example, with respect to the Trafalgar transaction, the complaint alleges that IASA failed to disclose to the Income Fund that the borrower had a $720,956 negative cash flow, the participation was in a second mortgage, and that the loan was for almost two million dollars more than the value of the property. With respect to the Landmark participation, IASA did not disclose that the guarantor had substantial other nonperforming or defaulted loans with IASA.

The complaint alleges that, in the fall of 1985, Crowe, J. Gaubert, Westcot, and others profited from their manipulation of the Income Fund by having IASA buy back their stock at grossly inflated prices using cash generated by the Income Fund's purchase of participations in IASA loans.

The complaint further alleges that during the months of March and April of 1986, IASA proposed and the Income Fund's loan committee approved, purchases of participations in several more risky and/or worthless loans. The Income Fund purchased participations known as Preston Frankford (supplemental) and Bean/Landmark (supplemental) on March 6. It purchased participations known as Northgate Construction, Hunter's Crossing and HCD/DeClara on March 31, and a participation known as Piper Glen on April 7. According to the complaint, Crowe and J. Gaubert, fraudulently approved "certain" of these loan participation purchases on behalf of the Income Fund's loan committee.

With respect to the Piper Glen transaction, the complaint alleges that the loan committee apparently never met, but further alleges that Crowe, J. Gaubert and Westcot "fraudulently

participated" in this purchase at various steps. The complaint alleges that only one member of the loan committee, Lane, approved the purchase of the participation in the HCD loan. The complaint does not specify who approved the Northgate construction and Hunter's crossing loan participation purchases. However, it alleges that Wescot served as the Income Fund's "independent qualified advisor" in connection with all six March/April purchases. In addition, Thomas C. Gragg, a vice president of IARE, signed the purchase agreement on behalf of the Income Fund. This same officer signed the purchase agreement for the 1985 participations as well.

McNeily alleges that federal regulators are responsible for losses stemming from the loan participation transactions completed in March and April of 1986. By February of 1986, IASA had run into serious financial difficulties. At that time, the Federal Home Loan Bank of Dallas (FHLB-Dallas) formally told IASA that it needed to enter into a supervisory agreement because its liability growth had increased for two consecutive quarters at an annual rate greater than 257. IASA's board agreed to FHLB-Dallas's proposed supervisory agreement. In March of 1986, IASA's Board approved a resolution requiring the federal regulators to approve any sale of loan participations by IASA to the Income Fund. During that month, federal regulators obtained the resignations of key officers and directors of IASA, two of which were members of the Income Fund's loan committee. On April 1, 1986, Milton Thomas, a former federal home loan bank board (FHLBB) member became chief executive officer of IASA. On April 7, Tom Hendricks, a former FHLB-Dallas vice president, became IASA's chief operating officer. Hendricks immediately installed himself as IASA's chief operating officer of real estate and as head of the Income Fund's loan committee.

The fifth amended complaint alleges that the FSLIC and FHLB-Dallas either tacitly or explicitly approved of or ratified the prior misconduct of IASA and further alleges that federal regulators, while in control of the day-to-day operations of IASA, caused IASA to breach its contractual and fiduciary obligations to the Income Fund. It alleges that the federal regulators did this in order to use the Income Fund's assets to keep IASA afloat. The complaint alleges that the federal regulators kept the Income Fund in the dark about IASA's financial condition and about IASA's numerous breaches of the partnership agreement prospectus and the mortgage services

agreement in order to use the Income Fund's assets. McNeily further alleges that the regulators failed to disclose material facts concerning the Income Fund's participation purchases during March and April, facts which, if disclosed, would have led the Income Fund to take immediate action to rescind those participations.

The fifth amended complaint alleges claims against the FDIC and the United States for breaches of contract, intentional breach of duty, negligent breach of fiduciary duty, negligence, gross negligence, civil conspiracy to defraud, common law fraud, violations of Texas securities laws, breach of duties of good faith and fair dealing, tortious interference with contractual relations, and negligent involvement in IASA's day-to-day operations. In addition, the complaint alleges claims against the FDIC for violations of RICO, conspiracy to violate RICO, violations of the Securities & Exchange Act of 1934, and violations of the Securities Act of 1933.

In February of 1991, the court dismissed several counts of the complaint as to the United States. In March of 1992, the district court dismissed the remaining claims against the United States. Soon thereafter, the district court dismissed McNeily's claim against the FDIC and against RTC Sunbelt Federal. In May of 1992, the district court designated its judgment as final under Rule 54(b) of the Federal Rules of Civil Procedure and McNeily timely appealed. Since that time, McNeily and the RTC have entered into a settlement under which McNeily has voluntarily dismissed his claims against the RTC. We therefore consider only McNeily's claims against the United States and against the FDIC.

## II.

The United States as a sovereign nation is immune from suit except as the United States has consented to be sued. *Williamson v. U.S. Department of Agriculture,* 815 F.2d 368, 373 (5th Cir.1987). One of the vehicles by which the United States has consented to be sued is the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80. The FTCA provides that the United States can be liable in tort for any

> negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). Congress, however, adopted several exceptions to this consent to be sued, which must be strictly construed in favor of the United States. *Atorie Air v. F.A.A.,* 942 F.2d 954, 958 (5th Cir.1991). Two such exceptions directly apply to McNeily's complaint. The first of these, known as the discretionary function exception, provides that the courts have no jurisdiction over claims against the United States

> based on the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved is abused.

28 U.S.C. § 2680(a).

The second exception to the FTCA that is relevant to this case bars claims against the United States "arising out of ... misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). This exclusion encompasses claims for negligent as well as intentional misrepresentation. *Williamson,* 815 F.2d at 377. It also covers both affirmative acts of misrepresentation and omissions of material fact. *Paul v. United States,* 929 F.2d 1202 (7th Cir.1991). Moreover, causes of action distinct from those excepted under section 2680(h) are nevertheless barred when the underlying governmental conduct "essential" to the plaintiff's claim can be fairly read to "arise out of" conduct that would establish an excepted cause of action. *Atorie,* 942 F.2d at 958. For example, a plaintiff cannot avoid the reach of § 2680(h) by framing his complaint in terms of negligent failure to prevent the excepted harm. *Garcia v. United States,* 776 F.2d 116, 118 (5th Cir.1985).

In dismissing McNeily's claims against the United States, the district court noted that the FTCA provides the only basis of jurisdiction over the United States in the complaint. It then held that all of McNeily's claims fell within the discretionary function exception to the FTCA. McNeily frankly concedes, as he must, that the district court properly dismissed the fifth amended complaint's "causes of action based on the federal regulator's conduct in the day to day affairs of [IASA]," under the recent Supreme Court case of *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). He contends, however, that some of the regulator's activities he relied upon for recovery were not discretionary functions as defined in *Gaubert.*

*Gaubert* involved a similar tort suit against the United States resulting from the failure of

IASA, the same savings and loan association involved in today's case. Plaintiff's complaint against the regulators in *Gaubert* paralleled McNeily's complaint in many respects. The *Gaubert* plaintiff complained of the regulator's actions in threatening to close IASA unless its management and Board of Directors were replaced. The *Gaubert* plaintiff also complained of the regulators' actions in replacing those officers and directors with new officers and directors including a former FHLB-Dallas employee. The plaintiff in *Gaubert* further alleged that:

> After the new management took over, FHLB-Dallas officials became more involved in IASA's day to day business. They recommended the hiring of a certain consultant to advise IASA on operational and financial matters; they advised IASA concerning whether, when, and how its subsidiaries should be placed into bankrupt cy; they mediated salary disputes; they reviewed the draft of a complaint to be used in litigation; they urged IASA to convert from state to federal charter; and they actively intervened when the Texas Savings and Loan department attempted to install a supervisory agent at IASA. In each instance, FHLB-Dallas's advice was followed.

*Gaubert,* 499 U.S. at ----, 111 S.Ct. at 1272, 113 L.Ed.2d at 344-45.

In *Gaubert,* the Supreme Court outlined a two-step test for applying the discretionary function exception. First, the exception covers only acts that are discretionary in nature, involving "an element of judgment or choice," and not acts involving mandatory compliance with "federal statute, regulation, or policy." *Gaubert,* 499 U.S. at ----, 111 S.Ct. at 1273, 113 L.Ed.2d at 346. Second, assuming that the conduct involves discretionary judgment, the exception applies only if the governmental conduct is "based on considerations of public policy." *Gaubert,* 499 U.S. at ----, 111 S.Ct. at 1274, 113 L.Ed.2d at 346-47.

Applying step one of its test to determine if the acts were discretionary, the Court held that the relevant statutory provisions left to the judgment of the federal regulators the decision of when to institute proceedings against any financial institution and which mechanism to use. *Gaubert,* 499 U.S. at ----, 111 S.Ct. at 1277, 113 L.Ed.2d at 351. It also observed that "there is nothing in the language or structure of the statutes that prevented the regulators from invoking less formal means of supervision of financial institutions." *Id.* at ----, 111 S.Ct. at 1277, 113 L.Ed.2d at 351. Applying step two, the court held that the regulatory actions in question involved the kind of policy judgment that the discretionary function exception to the FTCA was designed to shield. *Gaubert,* at ----, 111 S.Ct. at 1278, 113 L.Ed.2d at 352. Therefore, Gaubert's claims were barred.

Despite the similarities between *Gaubert* and this case, McNeily argues that some actions taken by the regulators fail step one of the *Gaubert* test for determining discretionary function. He invites us to examine regulatory actions that the Supreme Court had no occasion to discuss in *Gaubert.* However, an examination of the particular regulatory actions of which McNeily complains reveals that McNeily's claims fall within either the FTCA's discretionary function or the intentional torts exclusion.

First, McNeily complains of the federal regulators' failure to object to IASA's sale of participations to the Income Fund. Relatedly, he argues that the regulators' approval was given on the basis of invalid appraisals. This activity falls within the discretionary function exception. The regulators were properly concerned about IASA disposing of assets at bargain prices. The pleadings suggest no other reason the regulators took this rather ordinary step of requiring IASA to obtain their approval before selling its assets. McNeily's complaint alleges no facts indicating that the federal regulators, with their broad obligation to supervise many institutions, knew or had reason to investigate circumstances surrounding disposition of the savings and loan's property other than to ensure a fair price. Moreover, the complaint does not allege that the regulators took any steps to assume the duties of the Income Fund's loan committee. Also, if IASA, through its invalid appraisals, made misrepresentations of material fact upon which the Income Fund relied, and if the regulators were responsible for those misrepresentations, McNeily's claim would arise out of misrepresentations. Such a claim may not be pursued against the United States under FTCA. 28 U.S.C. § 2680(h).

Second, McNeily complains that the regulators, through IASA's officers and directors violated the Securities Act of 1933 in connection with IASA's sale of the loan participations to the Income Fund. McNeily also alleges that the regulators are responsible for an inaccurate 10k form the Income Fund sent to its unit holders after it purchased the participations. The Securities Act of 1933 provides for civil liability for any "person" who offers or sells a security "by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statement ... not misleading." 15 U.S.C. § 77*l*. The Act also provides that "every person who ... controls any person liable under sections 77k or *l*

of this title, shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 77*o*. Assuming without deciding that these statutes create a mandatory duty on the regulator,[2] McNeily's allegations on this claim seek relief against the United States for misrepresentation of its agents. The fraud and misrepresentation exception, 28 U.S.C. § 2680(h), bars this claim against the United States.

Third, McNeily complains that the federal regulators "disbanded" the Income Fund's Loan Committee. This allegedly occurred in March, when the regulators obtained the resignations of IASA officers and directors, two of which were also members of the Income Fund's loan committee. However, resignations, without more, could not have caused the injury of which McNeily complains. Indeed, given the allegedly fraudulent activities of the resigning loan committee members, it is hard to see how their presence could be missed.

In addition to these specific complaints, McNeily resorts to vague allegations to the effect that the federal regulators unlawfully "seized" the Income Fund and "forced" the unit holders to participate in worthless loans. Relatedly, McNeily argues that the regulators assumed a duty to operate the Income Fund in a non-negligent manner. What we know from the complaint suggests that the Income Fund's outgoing officers engineered the purchases and needed no help from the federal regulators. In any event, these allegations are vague and too conclusory to break down the sovereign immunity of the United States. All of McNeily's claims against the United States are barred by either the discretionary function or misrepresentation exception to the FTCA.

## III.

On appeal, McNeily pursues three claims against the FDIC. First he argues that the FDIC violated the Fifth Amendment by appropriating property belonging to the Income Fund's unit holders for a governmental purpose without providing just compensation. Second, he argues that the FDIC,

---

[2]Arguably, the Act's imposition of vicarious liability on a "controlling person" does not create a mandatory course of conduct for that person to follow. See *Underhill v. Royal,* 769 F.2d 1426, 1432-33 (9th Cir.1985); *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 957-58 (5th Cir.1981); *San Francisco Oklahoma Petroleum Exploration Corp. v. Carstan Oil Co.,* 765 F.2d 962, 965 (10th Cir.1985). If the regulators did not violate a mandatory duty, the United States is protected by the discretionary function exclusions. 28 U.S.C. § 2680(a).

when it assumed control of IASA and the Income Fund, assumed the contractual obligations of both entities but then breached those obligations. Third, McNeily argues that the FDIC violated federal RICO laws, 18 U.S.C. §§ 1961, et seq., in controlling the day-to-day activities of the Income Fund. We consider these claims below.

Relying on *Meyer v. Fidelity Sav.,* 944 F.2d 562, 567 (9th Cir.1991), McNeily argues that the FTCA has no application to a constitutional tort claim brought against an agency like the FSLIC which has consented to "sue or be sued."[3] The district court concluded that McNeily did not plead a constitutional tort in his fifth amended complaint. McNeily contends that the district court had a duty to read his complaint liberally, arguing that the facts alleged in the complaint give rise to a constitutional claim. The district court allowed McNeily to amend his complaint four times. The fifth amended complaint pleads twenty-seven claims against the FDIC, but makes no mention of an unconstitutional taking. Under such circumstances, a district court has no duty to "create a claim which appellant has not spelled out in his pleading." *Case v. State Farm Mutual Automobile Insurance Co.,* 294 F.2d 676, 677-78 (5th Cir.1961).

On his breach of contract claims, McNeily concedes that the regulators are not parties to or successors in interest to the contracts and did not expressly assume the contracts. He argues, however, that the FSLIC's actions in "seizing control of the Income Fund," a non-federally regulated entity, manifested the regulator's intent to assume the contractual obligations of IASA and the Income Fund. The district court concluded that McNeily had not met his burden of providing summary judgment evidence demonstrating that the FSLIC had impliedly assumed IASA's contractual obligations under the partnership agreement, the prospectus or the mortgage services agreement; McNeily had failed to show that the FSLIC's involvement in IASA went beyond "normal regulatory activities" and indicated a specific intent to assume contractual obligations. We agree. The summary judgment evidence reflects regulatory activity by FSLIC which it was authorized to conduct. This conduct raises no inference that FSLIC intended to assume the contracts of the troubled institution

---

[3]There is also authority holding the opposite to be true. *Ascot Dinner Theater, Ltd. v. Small Business Admin.,* 887 F.2d 1024, 1028 (10th Cir.1989). The Supreme Court has granted a writ of certiorari in *Meyer.* --- U.S. ----, 113 S.Ct. 1576, 123 L.Ed.2d 146 (1993).

or its subsidiaries.

Finally, we reject McNeily's contention that the FDIC may be sued under the RICO statute. As explained in *Berger v. Pierce,* 933 F.2d 393, 397 (6th Cir.1991), the FDIC is not "chargeable", "indictable", or "punishable" for violations of specific state and federal criminal provisions. Therefore, McNeily cannot meet the requirement of showing a "racketeering activity," which is a predicate for a civil RICO action. *Berger,* 933 F.2d at 397.

## IV.

For the reasons stated above, we affirm the district court's orders dismissing McNeily's claims against the United States and against the FDIC.

AFFIRMED.