**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 97-41214

---

DALE A. BROWN; ET AL

Plaintiffs,

DALE A. BROWN; R. SCOTT SATTERWHITE;
ANTHONY P. HODGSON

Plaintiffs-Appellants,

VERSUS

NATIONSBANK CORPORATION; ET AL

Defendants,

NATIONSBANK CORPORATION; JODIE JONES; CONN & COMPANY;
SOUTHERN TECHNOLOGIES DIVERSIFIED, L.P.; HAL FRANCIS, also
known as John Clifford; JOSEPH CARROLL, also known as Joe Carson;
HILTON HOTELS; LEISURE HOSPITALITY MANAGEMENT COMPANY doing
business as Sheraton Hotel-Astrodome; UNITED STATES OF AMERICA

Defendants-Appellees.

---

Appeal from the United States District Court
for the Southern District of Texas

---

September 8, 1999

Before DAVIS, STEWART, and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Dale A. Brown, R. Scott Satterwhite, and Anthony P. Hodgson

brought claims against the United States, federal agents, and

private businesses who assisted federal agents in an undercover operation designed to detect contract procurement fraud in the space industry. The district court dismissed all claims against the government, federal agents, and private defendants. Brown, Satterwhite, and Hodgson appeal. We AFFIRM.

## I. FACTS

Dale A. Brown, R. Scott Satterwhite, and Anthony P. Hodgson ("Appellants") owned and operated two respected and successful Houston-based corporations called TerraSpace, Inc. and TerraSpace Technology, Inc. The companies provided high-tech engineering and management services to the private and government sectors. TerraSpace, Inc. received several engineering and management contracts for services to the private sector. TerraSpace Technology was successful in securing engineering and software development contracts with aerospace firms and were awarded a multi-million dollar Space Shuttle software development contract.

In the Fall of 1991, the Federal Bureau of Investigation began a sting operation, called Operation Lightning Strike, designed to uncover contract procurement fraud and other illegal activity committed in the aerospace community. The undercover operation targeted employees of the National Aeronautic and Space Administration and aerospace contractors doing business with NASA. Both the NASA Office of the Inspector General ("OIG") and the Defense Contractor Investigative Service ("DCIS") participated in

2

the sting.

In May, 1992, FBI Special Agent James H. Francis, posing as a wealthy investor named John Clifford, initiated contact with Appellants Brown, Satterwhite, and Hodgson. Clifford told Appellants that he owned a Maryland-based company called Eastern Tech Manufacturing Company ("ETMC") and that he wanted to find a Houston-based aerospace firm to form a partnership with ETMC in order to gain contracts with NASA and its contractors. Appellants were not targets of the sting operation, but were selected by the FBI as entities that could be used in order to gain access to the aerospace community. Appellants were unaware that they and their companies were being set up by the FBI as tools of deception in an undercover operation.

Clifford represented to Appellants that he wanted to develop a miniature medical device, a "lithotripter," that astronauts could use to pulverize kidney stones while in space. Clifford suggested that his company, ETMC, would provide technology and facilities for the development of the lithotripter. Further, Clifford contended that the device would be developed into a multi-tissue ultrasonic imaging system.

In July 1992, as the plans for the lithotripter developed, Clifford offered Brown a job as the Chief Financial Officer and Vice-President of Marketing of another company ostensibly owned by Clifford, called Space, Inc. As the Vice-President, Brown was offered a monthly salary of $5,000.00 plus expenses. Brown was to

3

receive his salary through yet another one of Clifford's illusionary companies, Southern Technologies Diversified, L.P. ("STD"). Clifford directed Brown to perform a number of activities for Space, Inc. From August of 1992 to March of 1993, Brown made numerous presentations as the Chief Financial Officer and Vice-President of Marketing of Space and he spent time merging financial summaries of Clifford's businesses with Space. To further gain Appellants' confidence and trust, Clifford promised to lend them millions in venture capital for their companies.

As the Operation developed, the FBI enlisted the assistance of several private companies to legitimize and lend credibility to its fictitious business enterprises. During the summer of 1992, Nationsbank provided financial information via telephone to Brown's business associate, Neil Jackson, about Clifford and Clifford's business partner, Joe Carson (FBI agent Joseph Carroll). Nationsbank informed Jackson that Clifford and Carson had accounts with Nationsbank totaling one hundred thirty (130) million dollars and a one million dollar line of credit. In June and July, 1992, Dun & Bradstreet provided favorable information via telephone and fax about the FBI's front company, STD. In July, 1992, Conn & Company also provided favorable financial information via telephone regarding STD.

By October, 1992, the Operation had developed its facilities for the production of the lithotripters. Larry Seiler, a Vice-President of ETMC, flew Brown to Columbia, Maryland to view ETMC's

4

facilities and to learn about the manufacture of lithotripters. At this time, ETMC persuaded Brown that it had the capability to develop a product called the Printed Wiring Assembly Robotic Tinning System ("PWARTS"), for which it represented it intended to negotiate a future contract with the Tobyhanna U.S. Army base. In the following months, ETMC represented, via fax and telephone, various plans to develop other devices such as a digital pager, infrared sensors, and mine detectors.

In 1992 and 1993, Appellants worked hundreds of hours and spent large amounts of money bidding on projects. Appellants also introduced Clifford to managers at NASA and aerospace companies, including Rockwell, Lockheed, IBM, Loral, Boeing, General Electric, McDonnell Douglas, Martin Marietta, and others. Ultimately, Space submitted several successful bids on contracts.

In December, 1992, Clifford and Carson offered Brown an opportunity to develop a multi-million dollar hotel and dive resort in the Bahamas, called "The Isle of Gold." Persuading Brown to leave his job in the aerospace industry, Clifford and Carson promised him a large salary, excellent fringe benefits, and a personal plane. Because of this opportunity, Brown dissolved his business relationship with Satterwhite and Hodgson and made extensive arrangements to leave the country and sell his home.

On February, 26, 1993, Clifford told Jackson, Brown's associate, that a procurement officer from the U.S. Army's Tobyhanna base would be arriving in Houston. Clifford directed

Jackson to "entertain" the procurement officer and told Jackson to enlist Brown's assistance. On March 4, 1993, Brown and Jackson went to the Hilton Hotel at Hobby Airport in Houston. In the parking lot, Jackson provided Brown with a sealed envelope containing "entertainment funds," and told Brown to deliver the envelope to the procurement officer's hotel room. As Brown delivered the envelope to a man in the hotel, the FBI recorded the transaction, using audio and visual recording equipment in the room.

Six months later, on August 4, 1993, Brown learned that there was no miniature lithotripter device and that Clifford and Carson were government undercover agents. Attempting to convince Brown to work as an unpaid undercover informant to set up stings, the FBI agents physically and psychologically intimidated Brown. On numerous occasions throughout August and September, 1993, the agents questioned Brown for multiple hours without the presence of an attorney and detained him against his will. Brown was threatened with prosecution of twenty-one different crimes, which could result in sixty years imprisonment and over a million dollars in fines. The FBI agents also questioned Satterwhite on at least one occasion for approximately two hours.

In May, 1994, the FBI abandoned Operation Lightning Strike. A few months later, in August 1994, a federal grand jury indicted Brown for one count of offering a $500 bribe to a public official. The first trial resulted in a mistrial. The United States declined

6

to retry the case and later dismissed the indictment against Brown.

## II.  PROCEEDINGS

On January 6, 1996, Appellants presented claims to the FBI, the OIG, and the DCIS for injuries suffered from the undercover operation.  On February 22, 1996, Appellants brought this suit in the United States District Court for the Southern District of Texas.

## A.  Claims

Appellants made claims against the United States, through the actions of the FBI, OIG, and DCIS agents, under the Federal Torts Claim Act ("FTCA") for abuse of process, malicious prosecution, assault, intentional infliction of emotional distress, false imprisonment, and invasion of privacy.

Appellants made *Bivens*[1] claims against FBI agents Francis, Carroll, Jean Barrett Yetman, Michelle Wyckoff, and Sheila Chadwick for due process and Fifth Amendment violations.

Appellants also alleged violations of the federal Racketeering and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-1968, by Nationsbank, Conn & Company, Dun & Bradstreet, Southern Technologies Diversified, Eastern Tech Manufacturing Corporation, various employees of these private businesses, and FBI agents Carroll, Francis, and Yetman.

---

[1]*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

Finally, Appellants brought state law claims for: civil conspiracy against ETMC, Nationsbank, Dun & Bradstreet, Conn & Company, Hilton Hotels Corporation, various employees of the private companies and FBI agents Carroll, Francis, and Yetman; invasion of privacy claims against Hilton Hotels and Leisure Hospitality Management Company doing business as Sheraton Hotel-Astrodome; and interference with economic advantage and benefit, intentional infliction of emotional distress, and fraud and deceit claims against all defendants.

## B.  District Court Decision

The defendants filed, and the district court granted, Motions to Dismiss the Appellants' claims.  The district court ruled that the claims for abuse of process and malicious prosecution were barred by the discretionary function exception to the FTCA.  The district court ruled that the Appellants' FTCA claims for false imprisonment, assault, intentional infliction of emotional distress, and invasion of privacy were barred by the statute of limitations, as were the Appellants' *Bivens* claims.  The district court then found that the Appellants' RICO claims should be dismissed because the Appellees were protected by qualified immunity.  Finally, the district court ruled that the Appellants' state tort claims should be dismissed because they were barred by the principle of federal supremacy.

## III.  DISCUSSION

8

## A. Standard of Review

The district court granted the Appellees' Motions to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). We review the district court's dismissal of a complaint for failure to state a claim for which relief can be granted under FED. R. CIV. P. 12(b)(6) *de novo.  See Lowrey v. Texas A & M University System*, 117 F.3d 242, 246 (5th Cir. 1997).  The complaint must be liberally construed in favor of the plaintiff, and all the facts pleaded in the complaint must be taken as true.  *See Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 442 (5th Cir. 1986).  The district court may not dismiss a complaint under rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  This standard of review under rule 12(b)(6) has been summarized as follows: "The question therefore is whether, in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief."  5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 601 (1969).

## B.  Abuse of Process and Malicious Prosecution Claims

Appellants argue that the district court erred when it dismissed their abuse of process and malicious prosecution claims under the discretionary function exception to the FTCA.  The government urges us to affirm on the alternative ground that, as a

9

matter of law, Appellants failed to state malicious prosecution and abuse of process claims. *See Gulf Island, IV v. Blue Streak Marine, Inc.*, 940 F.2d 948, 952 (5th Cir. 1991)(In reviewing the district court's order, the appellate court can affirm on any ground presented to the district court, even though it may not have formed the basis for that court's decision.)

## 1. Malicious Prosecution

The FTCA applies state law to determine the government's liability for torts within the FTCA waiver of immunity. *See* 28 U.S.C. §§ 1346(b), 2674. Under Texas law, there are seven elements for a malicious prosecution claim: (1) commencement of a criminal prosecution against the plaintiff; (2) causation (initiation or procurement) of the action by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the absence of probable cause for the proceedings; (6) malice in filing the charge; and (7) damage to the plaintiff. *See Richey v. Brookshire Grocery Co.,* 952 S.W.2d 515, 517 (Tex. 1997). The government asserts, and we agree, that Appellants cannot meet the fifth criterion, absence of probable cause.

Brown was indicted for bribing a public official in violation of 18 U.S.C. § 201(b)(1)(A)& (C), which provides:

(b) Whoever (1) directly or indirectly, corruptly gives . . . anything of value to any public official . . . with intent

(A) to influence any official act; or

10

(B) to induce such public official . . . to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States;

shall be [subject to criminal liability].

Probable cause is defined as "the existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor [complainant], that the person charged was guilty of the crime for which he was prosecuted." *Richey,* 952 S.W.2d at 517 (citation omitted) (editing original). If the facts necessary to instigate a criminal prosecution are in dispute, the issue of probable cause is a mixed question of law and fact to be resolved by a jury. Where the facts underlying the decision to prosecute are not disputed, however, then the question of probable cause is a question of law decided by the court. *See Richey,* 952 S.W.2d at 518.

It is undisputed that Brown accepted and delivered an envelope containing money to a United States Army procurement officer at his hotel room. The only dispute concerns Brown's *mens rea* – what he knew or intended. "[T]he complainant's failure to make a further investigation into the suspect's state of mind does not constitute lack of probable cause if all objective elements of a crime reasonably appear to have been completed." *Id.* at 518. Even though the government's evidence might have been weak and the prospects of obtaining a conviction may not have been good, as a matter of law, the government has proffered proof of probable

11

cause, and thus, Appellants have failed to state a claim for malicious prosecution.

### 2. Abuse of Process

Under Texas law, there are three elements for an abuse of process claim: "(1) that the defendant made an illegal, improper or perverted use of the process, a use neither warranted nor authorized by the process; (2) that the defendant had an ulterior motive or purpose in exercising such illegal, perverted or improper use of the process; and (3) that damage resulted to the plaintiff as a result of such illegal act." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.,* 73 F.3d 546, 577 (5th Cir. 1996).

Appellants' allegations are fatally defective because they fail to allege use of the process other than the mere institution of the criminal complaint, which was not improper. *See In re Burzynski,* 989 F.2d 733, 739 (5th Cir. 1993). Thus, as a matter of law, Appellants have failed to state a claim for abuse of process upon which relief can be granted.

## C. RICO Claims

Appellants argue that the district court erred in dismissing their RICO claims against the government agents and private defendants on the basis of qualified immunity. Government officials performing discretionary functions are shielded from "liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of

12

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The district court determined that defendants were entitled to qualified immunity from the RICO claims because the Plaintiffs cannot show a violation of statutory rights secured by RICO. Specifically, the district court reasoned that "[t]he FBI agents are not liable for RICO violations in the performance of their duties because there can be no RICO claim against federal officials on account of their alleged official misconduct," citing *McNeily v. United States*, 6 F.3d 343, 350 (5th Cir. 1993). The district court misconstrued our holding in *McNeily*, which held that the **FDIC** cannot be sued under the RICO statute because the FDIC, as a federal agency, is not chargeable, indictable or punishable for violations of state and federal criminal provisions. *See id.,* relying on *Berger v. Pierce*, 933 F.2d 393, 397 (6th Cir. 1991). Had the Plaintiffs named the FBI as a defendant to this suit, the district court would have been on firm ground in dismissing RICO claims against that federal agency based on *McNeily.* However, *McNeily* does not support the grant of qualified immunity to the FBI agents or to the private individuals who acted at the direction of those agents. However, if the defendants are entitled to qualified immunity on some alternative ground, we will affirm the district court's dismissal. *See Gulf Island IV,* 940 F.2d at 952.

In assessing a claim of qualified immunity, we must determine

whether: (1) the plaintiffs have asserted a constitutional or statutory violation; (2) the law regarding the alleged violation was clearly established at the time of the operative events; and (3) the record shows that the violation occurred, or at least gives rise to "a genuine issue of material fact as to whether the defendant actually engaged in conduct that violated the clearly-established law." *Kerr v. Lyford,* 171 F.3d 330, 338 (5th Cir. 1999). If we determine that the official's conduct violated clearly established law, we address whether that conduct was objectively reasonable. *See Wren v. Towe,* 130 F.3d 1154, 1159 (5th Cir. 1997).

The Racketeering and Corrupt Organizations Act ("RICO") imposes criminal and civil liability upon those who engage in "a pattern of racketeering activity" defined as "any act or threat involving" specified state-law crimes, acts indictable under various specified federal statutes, and other federal offenses. *See* 18 U.S.C. § 1961(1). Section 1964(c) allows a private party who has been sustained damages from a RICO violation, to recover those damages. *See* 18 U.S.C. § 1964(c). Appellants' complaint alleges that the Government and private defendants' racketeering activities included mail and wire fraud, which are included among the enumerated predicate acts for a RICO claim. *See* 18 U.S.C. § 1961(1).

We are not persuaded that the Appellants have asserted a violation of statutory rights which were clearly established at the

14

time of the events. In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court held that the mail fraud statute did not prohibit schemes that defrauded people of their intangible rights to an honest and impartial government. Following *McNally*, Congress enacted 18 U.S.C. § 1346,[2] which, in one sentence, provided that "[f]or the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." In 1997, the Fifth Circuit, sitting *en banc,* held that, by enacting § 1346, Congress intended to protect the intangible right of honest services from wire fraud schemes by state actors. *See United States v. Brumley,* 116 F.3d 728, 733 (5th Cir. 1997) ("fraud statutes cover the deprivation of intangible rights."). However, prior to the *en banc* resolution of *Brumley*, we cannot say that such rights were clearly established by the enactment of § 1346. *See id.* at 736 (dissent)("It is therefore incomprehensible to us that the majority can conclude . . . that [§ 1346] reflects a clear statement of a Congressional intention to protect the citizenry of a state from corrupt state officials."). Because the rights asserted by Appellants were not clearly established at the time of defendants' alleged acts, we conclude that the district court did not err in dismissing Appellants' RICO claims.

---

[2]Added by Pub.L. 100-690, Title VII, § 7603(a), Nov. 18, 1988, 102 Stat. 4508.

**D.  Supremacy Clause and State Law Claims**

Appellants brought state law claims for civil conspiracy, invasion of privacy, interference with economic advantage and benefit, intentional infliction of emotional distress,[3] and fraud and deceit.  Appellants contend that the district court erred when it dismissed the Appellants' state law claims on the ground that they were barred by the federal supremacy clause.[4]

**1. Government Agents**

The individual agents' immunity from suit under Texas law is not at issue.  The Attorney General certified under 28 U.S.C. § 2679(d)(1) that the agents acted within the scope of their employment at the time of the events at issue, thereby substituting the United States as defendant on those claims, *see Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995).  This procedure is not challenged.

**2.  Private Defendants**

The district court also dismissed Appellants' state law claims against the private defendants under the federal supremacy clause.

---

[3]Appellants brought two separate claims for intentional infliction of emotional distress.  The claims brought pursuant to Texas state law are addressed here.  The causes of action seeking relief under the Federal Tort Claims Act are discussed below.

[4]It is not clear from the record before us, and we do not reach the question,  whether Appellants' state law claims are governed by the Texas  two year statute of limitations, TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 or the four year statute of limitations, TEX. CIV. PRAC. & REM. CODE ANN. § 16.004.  *See Williams v. Khalaf*, 802 S.W.2d 651, 658 (Tex. 1990).

16

While this Court has not addressed the issue of whether the supremacy clause preempts state law tort claims against private defendants acting at the direction of the federal government, there is some precedent to guide us.

In *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), the Supreme Court considered the issue of whether the supremacy clause preempted state law liability of independent contractors performing work for the federal government. Under *Boyle,* state law may be preempted where: (1) there is a uniquely federal interest and (2) there is a significant conflict between federal policy and the operation of state law. *See Boyle*, 487 U.S. at 504-05, 507.

The liability of private defendants for actions taken at the direction of agents acting within their authority is a unique federal interest. Private businesses and individuals provide invaluable assistance as informants who provide evidence against law violators or, as in this instance, lend credibility to FBI undercover operations. If private businesses were not eligible for immunity from state law claims arising from assisting undercover federal operations, this would provide a major disincentive to assisting law enforcement and would undermine the needs and interests of the federal government.

At issue then, is whether the federal policy conflicts with the operation of state law. If the private defendants committed what would have been illegal acts under state law at the direction

17

and control of agents acting within their authority, the operation of state law would conflict with federal policy.  In *Hunter v. Wood,* 209 U.S. 205 (1908), where state law conflicted with a federal court order, the Court precluded a state law prosecution of a railroad clerk who sold tickets pursuant to that order.  Similarly, this Court has suggested that federal immunity privilege should be extended to preclude an action against a telephone company who assisted federal law enforcement agents with wiretapping.  *See Fowler v. Southern Bell Telephone & Telegraph Co.,* 343 F.2d 150, 156-57 (5th Cir. 1965).  *See also Connecticut v. Marra*, 528 F. Supp. 381 (D. Conn. 1981) (holding that defendant working at direction of FBI was entitled to federal immunity from state law prosecution).  State law cannot operate to impede individuals who have government authority and act as is necessary and proper within that authority. *See, e.g., Cunningham v. Neagle,* 135 U.S. 1, 75 (1890).

If the private defendants acted in good faith by reasonably relying upon the authority of government agents, their actions are shielded from state law action.  In this case, the private defendants, in good faith, supported the FBI's undercover operation with credibility and legitimacy.  There has been no suggestion that the private defendants acted maliciously or attempted to derive personal gain from assisting in the operation.  Moreover, the private defendants' actions, consistent with the apparent authority

18

granted by the government agents, were objectively reasonable. Under the veil of apparent authority, the private defendants had no reason to believe that their actions were illegal or would cause injury to the Appellants. Thus, Appellants' state law claims against the private defendants are barred by the supremacy clause.

**E. FTCA and *Bivens* Claims: Statute of Limitations**

Appellants argue that the district court erred in finding that their FTCA causes of action and *Bivens* claims were barred by the statute of limitations. We affirm the district court's ruling as to Brown and Satterwhite. Although we conclude that the district court erred in holding that Hodgson's *Bivens* claims are time barred, we nevertheless affirm the dismissal of those claims on the basis of qualified immunity.

**1. FTCA Claims**

The FTCA applies a two-year statute of limitations from the accrual date of the cause of action. *See* 28 U.S.C. § 2401(b). A cause of action accrues, under federal law, "when the plaintiff knows or has reason to know of the injury which is the basis of the action." *See Moore v. McDonald*, 30 F.3d 616, 620-21 (5th Cir. 1994). The plaintiff's knowledge of the injury depends on two elements: (1) the existence of the injury; and (2) the connection between the injury and the defendant's actions. *See Piotrowski v. City of Houston*, 51 F.3d 512, 516 (5th Cir. 1995).

After carefully reviewing the Appellants' Second Amended

19

Complaint, we conclude that their claims for assault, false imprisonment, intentional infliction of emotional distress, and invasion of privacy are barred by the statute of limitations. They rest on allegations of events that occurred in August and September 1993. Appellants presented their claims on January 8, 1996 and January 10, 1996. Because the claims were presented more than two-years after the events giving rise to the complaint, the district court was correct in dismissing them.

### 2. *Bivens* Claims

We also hold that Brown and Satterwhite's *Bivens* claims for due process and Fifth Amendment violations are barred by the statute of limitations. Under *Bivens*, a person may sue a federal agent for money damages when the federal agent has allegedly violated that person's constitutional rights. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971). A *Bivens* action is controlled by the applicable state statute of limitations. *See Alford v. United States*, 693 F.2d 498, 499 (5th Cir. 1982) (per curiam). This Court, applying Texas law, has held that the statute of limitations period on a *Bivens* claim is two years. *See Pena v. United States*, 157 F.3d 984, 987 (5th Cir. 1998). Brown became aware that he had been injured by the Defendants' alleged violation of his constitutional rights on August 10, 1993, when the FBI agents revealed to him that he had been expending his time and energy furthering the deceptions of

20

Operation Lightning Strike, rather than his own business interests. Likewise, the pleadings allege that the FBI revealed the undercover scheme to Plaintiff Satterwhite on August 20, 1993. However, we find nothing in the record that establishes when Plaintiff Hodgson was made privy to this information. We therefore affirm the district court's holding that Brown and Satterwhite's *Bivens* claims are barred by Texas' two-year statute of limitations, but find that we are unable to affirm the district court's dismissal of Hodgson's *Bivens* claims on statute of limitations grounds.

### 3. Qualified immunity

Although neither the pleadings, the district court's order nor the briefs develop the analysis, it is obvious that defendants have a qualified immunity defense to the *Bivens* claims. Therefore, in the interest of judicial economy, we affirm the dismissal of Hodgson's *Bivens* claims on that alternative ground. *See Gulf Island, IV*, 940 F.2d at 952.

"Governmental officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct [does] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wyatt v. Cole,* 504 U.S. 158, 166 (1992). Hodgson's *Bivens* claims are bottomed on defendants' alleged violations of his constitutional

due process rights.[5]

No court has addressed the particular issue presented by this case: the specific limits on federal agents' authority in undercover operations. The district court found no limits on the power of federal agents operating under cover, reasoning that if Appellants are allowed to pursue state law causes of action it would "effectively stop" federal undercover operations because, "by their very nature [they] seek to invade the privacy of those who violate the law." The district court went on to hold, without citation to authority, that "[t]he constitutional structure of our federal system does not permit private litigants to police federal law enforcement activities by asserting state law claims against federal law enforcement agencies or their agents." The district court erred: it asked the wrong question and reached the wrong conclusion.

The district court should have asked whether it was constitutionally permissible for federal agents to inflict damages on innocent non-targets[6] during an undercover operation and refuse them compensation. Because the Fifth Amendment due process guarantee against conscience-shocking injury imposes clear limits

---

[5]Brown and Satterwhite brought additional *Bivens* claims based on violations of their rights to remain silent and to consult with an attorney during their encounters with agents. Hodgson makes no allegation that he suffered similar violations.

[6]We emphasize at the outset that the legitimacy of the operation vis-a-vis those who violate the law, i.e. the targets of Operation Lightning Strike, is not at issue in this analysis.

22

on law enforcement conduct, we conclude that it was neither necessary nor proper for the defendants in this case to destroy the lives and businesses of innocent non-targets in the name of law enforcement.

"The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539 (1974). The Due Process Clause was intended to prevent government officials from abusing their power or employing it as an instrument of oppression. *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 126 (1992). The cognizable level of executive abuse of power is that which "shocks the conscience," violates the "decencies of civilized conduct" or interferes with rights "implicit in the concept of ordered liberty." *Rochin v. California*, 342 U.S. 165, 209-210 (1952). Obviously, this guarantee of due process protects citizens against deliberate harm from government officials. *See Daniels v. Williams*, 474 U.S. 327, 331 (1986). Allegations of lesser culpability have been held adequate to state a claim in some circumstances. For example, deliberate indifference suffices to impose due process liability when government actors fail to provide adequate care for pretrial detainees with serious medical needs. *See Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996)(en banc). However, harm inflicted due to government actors' simple negligence is categorically beneath the threshold of constitutional due process. *See Daniels*, 474 U.S.

23

at 328.

The Supreme Court recently provided a road map for navigating mid-level-culpability due process claims. In *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), parents of a motorcycle passenger killed in a high-speed police chase brought a 42 U.S.C. § 1983 action against the officer and governmental agencies involved, alleging deprivation of their decedent's substantive due process right to life. *Lewis,* 118 S. Ct. 1708, 1712. The Supreme Court rejected the plaintiff's contention that proof of deliberate indifference by the officer would be sufficient to establish a due process violation. *Id.* at 1711. "A police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to everyone within stopping range, be they suspects, their passengers, other drivers or bystanders." *Id.* at 1720. Analogizing the circumstances of a police chase to the situation of officers called on to quell a prison riot, the Supreme Court held that "'[a] deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.* at 1720, quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986). The court went on to distinguish situations where mid-level fault

was sufficient to impose liability. For example, liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. *See Lewis*, 118 S. Ct. at 1720. "When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking. But when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" *Id.,* quoting *Daniels v. Williams*, 474 U.S. at 332.

Applying the *Lewis* analysis to the FBI's alleged activity in this case, we conclude that the FBI made decisions which harmed the Plaintiffs after ample opportunity for cool reflection. In fact, they invested almost two years and thousands of man hours in developing the sting operation. Thus, the due process clause protects the Plaintiffs from any harm that arose from the officers' deliberate indifference. The facts, as pleaded, establish at least that level of federal agent culpability as Operation Lightning Strike evolved into a disastrous boondoggle. We therefore hold that Hodgson's allegations that federal agents inflicted damages on him, an innocent non-target, during this particular undercover operation and refused him compensation states a claim under *Bivens*.

25

However, because we address today for the first time the parameters of due process protections afforded innocent third parties injured by law enforcement sting operations run amok, and because the Supreme Court's language that drives our analysis appeared in a case decided in 1998, we cannot say that the due process rights claimed by Hodgson were clearly established during 1992-94. *See Lewis,* 523 U.S. 833. We therefore affirm the district court's dismissal of Hodgson's *Bivens* claims on the alternative basis of qualified immunity.

## IV.  CONCLUSION

Based on the foregoing, we affirm the district court's dismissal of Appellants' suit.

AFFIRMED.